on behalf of the appellant, Usri George Salama. In this case, the defendant, and there are two defendants, Western Wind Energy Corporation and Western Solargenics, so for easy ways to put it, I'm going to just call them Western Wind collectively. So Western Wind essentially has one argument, and that is that Mr. Salama waived and released his rights to vested stock options when the parties entered into a settlement agreement. Today I'm going to focus primarily on two arguments. Number one, that there was a failure of consideration, and so no enforceable settlement agreement existed. And then number two, assuming that an enforceable settlement agreement did exist, that the breach of contract claim that Mr. Salama has brought in this case did not exist at the time the parties entered into the settlement agreement. With respect to the first argument, in the court's memorandum and order granting Western Wind's motion for summary judgment, the court determined that whether Mr. Salama's stock options had expired was a fact question. So if we start with that proposition, and we therefore have to presume that Mr. Salama had 275,000 vested stock options at the time the parties entered into the settlement agreement, the settlement agreement provided that Western Wind was to do one of two things. They were to provide $119,000 worth of stock to Mr. Salama, or alternatively, if there were some issue with the provision of that stock under the Toronto Stock Exchange, Western Wind was to provide, pay Mr. Salama $119,000 in cash. May I ask you a question? Yes. It seems pretty clear that it was your client who proposed an alternative when the first two options became unavailable for different reasons. And it was your client's idea, and Western Wind signed on, and what happened happened. So even if we were to concede that there was some want of consideration, or at least different consideration, if it was a partial failure as opposed to a complete failure, because clearly your client got value for the transaction that ended up occurring, what's the effect of that on your proposition that that vitiates the settlement agreement? We don't believe there was partial consideration at all. We believe there was a complete failure. Your client didn't get anything? He got something, but he received something to which he was entitled anyway, and that was, he was able to exercise a portion of the stock options that he already had. But had there not been this transaction that he figured out a way to have occur, he wouldn't have gotten anything. Well, there's no evidence in the record that he would not have been able to exercise the options on his own, for example. He would have had to put up $100,000 plus. $119,000. Or however many he decided to exercise, that's correct. It would have been a big benefit to have the money, the options exercised without him having to make that payment, no? Given the price difference and the day that it occurred, he ended up to the better. Well, he would have been entitled to that anyway, regardless. There's nothing in the record that talks about where would that money have come from. Did Mr. Salama have that money himself to exercise them? Could he have borrowed that money from someone else to exercise them? What we have here is he was entitled. He had to give that person money back. I mean, it's... That's correct, but the agreement provided that Western Wind had to do one of these two things, and they ultimately did neither. But they did what he proposed, and one thing he didn't propose was, fine, no agreement, here's a check for $119,000, pony up, because I'm entitled to that anyway. He did not propose that at the time. Western Wind indicated that it did not have the money to pay him $119,000. No, that's my point. He didn't offer to pay his own money, as you're suggesting he could have. He could have, that's right. He did not propose that. And when the two options were not viable, according to Western Wind, what the then General Counsel, Alana Steele, said was, you know, this isn't going to work, we're going to have to find another way. It was only then that Mr. Salama proposed that. But he didn't say in making that proposal, and this is it, this is going to be what sort of satisfies the company's requirements and obligations under the agreement. I think he does have to say that because it goes to the intent of the parties. What did Mr. Salama expect and understand was happening? Sure didn't he expect to have to pay his own money? I don't know if he did or didn't. That's not in the record. He didn't propose it. He did not propose that. That's correct. You didn't respond in your briefs, as I recall, to the accord and satisfaction argument. The accord and satisfaction argument, as I understand it, was not raised by Western Wind. It was raised by the district court. Judge Ellison did raise that, and I believe we did address it in our brief to say that we do not believe it was an accord and satisfaction for a couple of reasons. Number one, there was a provision in the settlement agreement that said if the agreement were to be modified or amended, it had to be signed off on in writing by both parties. Number one, that did not happen. And number two, this wasn't, as I said before, a situation where Mr. Salama proposed, if you guys pay this $119,000, if you loan it to me for a couple of hours, this sort of satisfies everything. They did have a written exchange on the proposal, the acceptance of the proposal, and the way in which it would be implemented. That is correct, yes. That would not satisfy the merger requirement? It would not, because he was still owed this other, he was still entitled to these other stock options. But that's not because of a lack of written record, a lack of a written agreement. I'm sorry, say it again. There is a writing that evidences their agreement. There was a writing that evidenced that that was the agreement, but there's nothing, no writing that exists, and there were no communications in terms of oral communications where Mr. Salama indicated that that satisfied the obligations of Western Wind. Not even with respect to the settlement agreement? No, I don't believe so. So Mr. Salama did not receive the $119,000 free and clear. He had to pay that back, as I said, and as a result. He sold the stock that day or the next day and had more than that. I suppose he could have, but there's nothing in the record that indicates what he did. There's nothing, and we don't know what he did with that, according to the record. So he could be the new perfect example of chutzpah, says, I didn't get anything except for more. Mr. Salama would have been entitled to that anyway, because he had those vested options. But he hadn't done anything to exercise them. He had not up until that point, and he only did so when he was trying to come up with some way to sort of move the case forward after it had stagnated for a number of months at that point, or several weeks, I should say. The second argument is that the breach of contract claim that Mr. Salama had was not ripe. It did not exist at the time the parties entered into the settlement agreement. In the settlement agreement, Mr. Salama agreed to release Western Wind from any and all claims which existed as of or prior to the date he executed the settlement agreement. He executed the settlement agreement on October 5, 2011. One week later, a representative of Western Wind executed the settlement agreement. It was not until a few months later, so early January of 2012, that Mr. Salama was prevented from exercising the remaining options, and that's when Ms. Steele said to Mr. Salama, essentially, you can't exercise those, they've expired. Western Wind could have sought a release from Mr. Salama to release future claims. That does happen sometimes. They chose not to do that here. And so as— Known or unknown, but even if there is some ambiguity in that statement because of the We have to read the whole contract, the contract as a whole. How do you get around the provision that says the parties intend this release to be as general as possible, covering every conceivable contingency which might arise in the future in connection with Salama's provision of consulting services, and then it goes on. Right. So I think that it sort of dovetails into the third point, which I was only going to get into if I had time today, and that was what do we look—how do we look at the contract? Is it ambiguous on its face? What was the intent of the parties? So that all kind of comes into play together, and so we have to look at what the intent of the parties was. At the time the settlement agreement was entered into, there was no discussion of stock options, and you have to remember, there was an earlier case that was filed, an earlier lawsuit, and that was what the settlement agreement stemmed from, a settlement of that. That was a breach of contract and an unjust enrichment. Those were the two claims in that case. It was nothing to do with stock options. And so as a result, the parties did not intend to release stock options, despite what that language says. So when you're looking at just that language, you can't look at it in a vacuum. You have to look at the document, and then you can—if there—the court determines that there is latent ambiguity, if there are collateral things that happened, the court can look at that, and then parole evidence can be considered. Yes? Looking at the Chaplain v. Nations Credit Corp. case, how do you distinguish the way in which that court approached the broad, similarly broad language that released any and all claims arising by reason of, or in any way connected with, the plaintiff's employment relation to the defendant, which was applied to a later claim for ERISA benefits? The court—the release didn't mention the words ERISA benefits. The court says they're covered, even though the causes of action for the denial of those benefits hadn't accrued. So how do you get around both of those points as they apply to this case? Right. Well, and I don't recall the name of the case offhand, but there is a case in our brief that talks about when specific things are not carved out of settlement agreements, whatever that may be, stock options in this case here, then those survive. They were not released, in other words. So that is my response to that. If circuit case as well? I don't recall, Judge. I can certainly—I can look and get back with you on the rebuttal. I can as well. But I know it is in our brief. All right. Do you have, and other than saying there's some other case somewhere that points to a different result, do you have a way of distinguishing Chaplain? Well, I mean, I think what we have here is, and I'm going to use a hypothetical, if an individual has pension benefits, for example, they've worked for a company for a number of years, and they have some employment dispute with their employer. The company's settled that claim, whatever it was. Those pension benefits tend to, unless there were some specific carve-out for those, they would tend to exist if they were vested. And that's what we have here. We have vested benefits. There was no, as I said, reference to them. There was no discussion of them. The underlying case was not about them. Mr. Salama understood that those benefits existed. That was obvious by the fact that he proposed to Ms. Steele that, hey, here's an idea. You guys can't get these two things to work. The two things you're going to provide me, maybe we can do this instead. And so his understanding was these things still exist. And so if he did not believe he was waiving those, releasing those benefits, then they're in existence. They're in effect. So that's how I would respond to that. And as I was saying earlier with respect to looking at the four corners of the document, were the stock options released by Mr. Salama? We can look at, as I said, parole evidence if the court determines that there's a latent ambiguity. And so at the time that Mr. Salama entered into the settlement agreement, in October of 2011, his belief was he had these 275,000 options. He had no belief to the contrary. And it wasn't until weeks after the parties entered into the settlement agreement that Ms. Steele said for the first time, wait a minute, that just isn't the case. And so again, there was not intent here. There was not a meeting of the minds. And so... Okay. All right. You finished, Mr. Sincouli? Yes, Your Honor. We'll go to Mr. Stubbs. Thank you. If you want, if you are uncomfortable. May it please the court. When my client's Western Wind filed a motion for summary judgment, it was intended as a rifle shot. It was intended to go straight to the release, and it was intended to say the release waives everything. It's over. We've got a divorce. We were hit with a shotgun response that, wait, there could be ambiguity, there could be fact questions, there could be failure of consideration. We kept looking for some evidence, some facts that showed that there was ambiguity or was failure of consideration. And we never did see any. And the judge didn't see any either when he made a very careful review of all of the contracts between the parties, the first consulting agreement, second consulting agreement, the stock option plan, the awarding of the stock option plan in the first consulting agreement, the settlement agreement, the termination agreement, the arbitrator's award in the first instance, in the first lawsuit. Our rifle shot was that the settlement agreement bars the second lawsuit. And we were entitled to see some evidence of why it did not bar the second lawsuit. We don't think the plaintiff has offered any to the extent that the plaintiff offered any at all. It was a self-serving declaration that claimed that he had no intent to give up what he referred to as a vested interest. Mr. Sankole just called it a vested benefit. That's important. I mean, it just seems to me if he had carefully read that settlement agreement and he even remotely thought that he had some other claim that was out there, he would have said something about, look, this doesn't cover that claim. Your Honor, if ... I mean, if your claim is so totally ... I mean, the settlement agreement is so totally inclusive of all matters that he surely would have said something unless he just was not thinking about anything. Your Honor, it would have been simple for him to release any and all claims except for my claim to stock options. And that wasn't in there. It was any and all claims. The language, which is set forth on page four of the opinion of the district court, it's almost brutal for me to read it to you. It's so comprehensive. I didn't write it, and so I can't take credit for it, but it's so repetitious. I didn't think ... I didn't see how they could nail it down any further. And neither could I, Your Honor. And yet we're faced with another lawsuit, and we went through another mediation, and then we filed our motion for summary judgment, and we kept it simple. We had another two or three motions for summary judgment we could have filed, but in any event, what the plaintiffs now are claiming is not that there are some material facts that this court needs to be aware of that might change your mind, but that the district court just got it wrong. They misapplied the law, because that's all we were asking is, say, assume this is the agreement the parties signed, then as a matter of law, whether that's Texas law, federal law, or Canadian law, we're a Canadian corporation, there simply is no precedent for signing a exemption for something that you did not specifically carve out as an exemption. The Chaplain case, Your Honor mentioned just a moment ago, is as close to an ... At their best, it was an afterthought. Is this court's case that is as close to an all fours white horse case as I've ever seen. And if ERISA benefits weren't listed, and they are gone because of the settlement agreement, then I think this claim of entitlement to a benefit arising out of the provision of Salama's consulting services to Western Winn, I think that's covered. Does the court in satisfaction need to enter the analysis? I don't think it needs to. I think the court was generous to go there and to say that Mr. Salama proposed this solution and that the parties went to a lot of trouble to make sure that we got this thing resolved. And if that's not a court in satisfaction, I'm not sure I've ever seen a court in satisfaction. So I think we're down to whether or not that either under Texas law, where we have the Kessler case, and it too is about as close to an all fours opinion as you can get. It's even broader language, and what it says is you can bring a claim against a hospital for cutting off your professional services to practice in that hospital, and you can sign a general release and waive tort claims for exposure to toxic chemicals. So that's what Texas law is, and we've already, Chaplain lays out clearly what federal law is, and Chaplain also refers to Texas law and dispenses with the Texas law as well. So the judge did not get it wrong. He applied the law that's out there, and I'd be happy to give the court an opportunity to ask questions or give you back some time. Thank you very much, Mr. Stubbs. You have minutes for rebuttal. And I'll be brief with my rebuttal time as well. It boils down to us that Mr. Salama did not receive either of the two things that were supposed to be provided to him. He received something else instead. Therefore, there was not an enforceable agreement because of their consideration. You're saying they fooled him. Well, they may have fooled him. I think what happened is, well, I won't get into what I think happened because that's... I know, but I mean, it's essentially what you're saying, that all this language and everything, they somehow fooled him into thinking, but I don't see... I mean, that sounds like kind of the last resort that one can take in a case. Well, so we don't believe... You made a good argument. I'm not faulting you. You work with what you got. I understand, but I will tell you, I'm not just working with what I have. I mean, I believe that Mr. Salama didn't release his claims, and I believe that they arose after he entered into the settlement agreement, and he didn't intend to release them. And so I don't want to reiterate everything that I said earlier. So with that, I will... Unless you guys have questions, I can answer. You've made a good argument, as good as you could make under the circumstances. Thank you. Thank you. We will call the next case.